NOT RECOMMENDED FOR PUBLICATION
File Name: 24a0232n.06

Case No. 23-3927

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jun 04, 2024
KELLY L. STEPHENS, Clerk

AMBER GOODEN,

       Plaintiff-Appellant,

v.

COMMISSIONER OF SOCIAL SECURITY,

       Defendant-Appellee.

)
)
)
)
)
)
)
)
)
)
)
)

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF OHIO

O P I N I O N

Before: SUTTON, Chief Judge; McKEAGUE and BUSH, Circuit Judges.

**McKEAGUE, Circuit Judge.** Amber Gooden applied for disability insurance benefits in 2014. A Social Security administrative law judge denied her application. She applied again in 2020. Another administrative law judge denied that application, too. Gooden made her way to federal court. There, she argued that the second administrative law judge erroneously relied on the *first* judge's decision and failed to assess her *second* application independently.

The judge properly denied Gooden's second application. We **AFFIRM**.

**I.**

**A.     2014 Applications and 2018 Denial**

Amber Gooden first applied for disability insurance benefits and supplemental security income in December 2014. She alleged she had become disabled as of November 20, 2014. After an initial denial of her application, she requested a hearing, which occurred in early 2018.

That April, an administrative law judge (ALJ) denied Gooden's applications, finding that Gooden was not disabled within the meaning of the Social Security Act. *See* 42 U.S.C. §§ 416(i), 423(d). Under the Social Security Administration's five-step evaluation to determine disability, the ALJ first found that Gooden had not engaged in any "gainful" work since her disability onset date of November 20, 2014. *See* 20 C.F.R. § 404.1520(a)(4)(i). The judge moved to step two. There, the ALJ found that Gooden had several severe impairments, including cardiomyopathy, ischemia, hypertension, depression, and anxiety, all of which "significantly limit" her ability to perform basic work activities. At step three, though, the ALJ found that none of those impairments automatically qualified as an enumerated disability under Social Security regulations. So the ALJ moved to steps four and five, both of which depend on a claimant's "residual functional capacity"—in essence, the type and amount of work a disability applicant can still do even after the onset of her disability. *See* 20 C.F.R. § 416.945.

Balancing various medical data, the ALJ found that Gooden's residual functional capacity included sedentary work with occasional ramp- and stair-climbing. The judge further determined that Gooden could "occasionally use foot controls" with her "left lower extremity." And the judge concluded that she was "limited to performing simple routine tasks and tolerating few changes in a routine work setting." At step four of the evaluation, with that capacity finding in mind, the ALJ determined that Gooden was unable to perform her past work, which included jobs like home health attendant, packager, and fast-food worker. *See* 20 C.F.R. § 404.1520(a)(4)(iv). But Gooden's claim failed at the fifth and final step. There, the judge determined that, despite her impairments, Gooden *could* perform one of any "significant" number of jobs that exist in the national economy. Relying on testimony from a vocational expert, the ALJ found that Gooden could work in certain sedentary positions, like "document preparer," "call-out operator," and "film touch-up inspector." So, under the agency's evaluation framework for applying disability statutes, Gooden was not disabled as defined by the Social Security Act. The Social Security Appeals Council denied further review of the 2018 ALJ decision.

### B.       2020 Applications and 2021 Denial

In January 2020, Gooden applied again for disability insurance benefits and supplemental security income. Her new claims alleged a period of disability beginning on April 24, 2018—the day after the first ALJ denied Gooden's initial applications. In describing Gooden's application history, the second ALJ noted the prior decision, stating that "I must adopt the prior decision's residual functional capacity, as well as its findings on past relevant work, date of birth, and education, unless there is new and material evidence or changed circumstances" or "there has been a change in the relevant law." But, the ALJ also clarified, "I do not adopt the prior ALJ decision, as the claimant has presented new and material evidence for the unadjudicated period"—here, the period of disability beginning on April 24, 2018. The ALJ continued, "Nevertheless, this new and material evidence continues to support a finding of 'not disabled,' as explained in the decision below." And she concluded by "partially" adopting the prior decision's "past relevant work" findings.

Over thirteen pages of analysis, the second ALJ marched through the five-step evaluation for identifying a legal disability. At step one, the second ALJ concluded that Gooden had worked after April 24, 2018, but that the work did not constitute "gainful" employment under Social Security regulations. This finding specifically covered the period after the first ALJ decision. At step two, the second ALJ found that Gooden had several severe impairments. Many were identical to the impairments in the first decision. But the second ALJ also added two new impairments: obesity and degenerative disc disease. At step three, the second ALJ determined that Gooden's impairments did not qualify as enumerated disabilities. So the ALJ then moved on to determining Gooden's residual functional capacity.

The second ALJ found that Gooden's residual functional capacity included sedentary work; the ability to lift or carry ten pounds occasionally; standing and walking for two hours in an eight-hour day; sitting for two hours at a time with occasional breaks; occasional use of foot controls with her left lower extremity; occasional ramp- and stair-climbing; occasional balancing and

stooping; and occasional exposure to extreme heat, cold, humidity, and vibration. The second ALJ determined that Gooden could never kneel, crouch, crawl, or climb ladders, ropes, or scaffolds. She also found that Gooden could not work at unprotected heights, work with moving mechanical parts, or engage in commercial driving. And she concluded by determining that Gooden could carry out and perform simple instructions and routine tasks.

In setting those limits, the second ALJ referenced several findings that the first ALJ made about Gooden's pre-2018 medical history. Specifically, the judge identified a November 2014 "episode" of left-leg ischemia and several coronary injuries. And the second ALJ agreed with the first judge that Gooden's symptoms for these impairments had improved with time and treatment. But then the second judge considered evidence that postdated Gooden's first application, most of which suggested that Gooden's symptoms from these conditions had worsened—and that she now suffered from new impairments, like obesity. The judge found that, while Gooden's claims about the "intensity, persistence, and limiting effects" of her symptoms were "not entirely consistent with the medical evidence," her residual functional capacity was nonetheless less than what the first ALJ had found. And the judge noted that she could not "give any specific evidentiary weight" to "any prior administrative medical findings," so she "fully considered" new assessments that state consultants provided in 2020. Those assessments incorporated, at least in part, specific findings made in the first ALJ decision, largely because, in the consultants' words, Gooden's "conditions have not significantly changed since the date of the [2018] decision."

With Gooden's functional capacity set, the second ALJ found at step four that Gooden was unable to perform her past work. But at step five, this judge—like the first—found that Gooden's capabilities meant she could perform a significant number of jobs in the national economy. Those jobs included "document specialist," "surveillance system monitor," and "ticket counter." With that finding, the ALJ concluded that Gooden was not disabled and denied her applications for Social Security benefits. Again, the Appeals Council denied further review.

**C.      Procedural History**

Gooden challenged the agency's decision in federal district court. She alleged that the second ALJ had erred by stating she "must adopt" the first ALJ's findings. The district court disagreed, finding that the ALJ properly applied Sixth Circuit precedent and independently assessed Gooden's new applications. Gooden timely appealed.

**II.**

**A.      Standard of Review**

We review de novo a district court's order in a Social Security case. *Emard v. Comm'r of Soc. Sec.*, 953 F.3d 844, 849 (6th Cir. 2020). We review the administrative record to determine whether "substantial evidence" supported the agency's factual findings. 42 U.S.C. § 405(g). That's not a high threshold. *See Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). It requires "more than a mere scintilla" of evidence, but only "such relevant evidence" that a reasonable mind "might accept as adequate to support a conclusion." *Id.* (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)). Where a claimant alleges that the agency applied the incorrect legal standard, we review the legal criteria de novo and may reverse even if substantial evidence otherwise supported the decision. *See Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004). Otherwise, the agency's factual findings—if supported by substantial evidence—are "conclusive." *Biestek*, 139 S. Ct. at 1152 (quoting 42 U.S.C. § 405(g)).

**B.      "Fresh Look" at New Social Security Applications**

Gooden claims that the second ALJ failed to give Gooden's second application an independent "fresh look," as required under our precedent. *See Earley v. Comm'r of Soc. Sec.*, 893 F.3d 929, 931 (6th Cir. 2018). As evidence, Gooden points to the ALJ's statement that she "must adopt" the first ALJ's "residual functional capacity" unless "there is new and material evidence or changed circumstances" or "there has been a change in the relevant law." Gooden argues that this error alone requires reversal and, in the alternative, that the error resulted in the second ALJ giving

too much weight to opinions from two state mental-health consultants. The Commissioner responds that the second ALJ *did* assess Gooden's second application anew, pointing to the judge's statement that she did "not adopt the prior ALJ decision, as the claimant has presented new and material evidence for the unadjudicated period." We agree with the Commissioner. The second ALJ properly gave "fresh review" to Gooden's new application by stating that she was not bound by the first ALJ's findings and independently assessing each allegation in Gooden's new application. *Id.* at 934.

The Commissioner draws our attention to a recent opinion in which we rejected a challenge to a successive disability insurance denial. That case bears a striking resemblance to this one. *See Dennis D. v. Comm'r of Soc. Sec.*, No. 23-3667, 2024 WL 1193662, at \*1 (6th Cir. Mar. 20, 2024). The opinion is unpublished, so it does not control here. Nonetheless, its reasoning squarely applies. And under that reasoning, the second ALJ did not err.

As *Dennis D.* explains, Social Security judges must give subsequent applications for a new period of disability a "fresh look" to assess whether any changed condition or new regulatory threshold justifies a different outcome than an earlier application. *See id.* at \*4; *Earley*, 893 F.3d at 931–32. That said, res judicata principles do apply to the earlier determination—meaning that neither the government nor an individual applicant can relitigate a "past final decision for no reason other than to take a second bite at the same apple." *Earley*, 893 F.3d at 933; *see also Drummond v. Comm'r of Soc. Sec.*, 126 F.3d 827, 842–43 (6th Cir. 1997).

It plays out like this. Suppose someone files an application in 2014. They seek benefits for a period of disability from, say, 2010 to 2014. An ALJ determines the person was not disabled during that time period. Assuming exhaustion of the review process, that determination binds the government and the applicant in later litigation. For example, if the applicant files a new application in 2024 seeking benefits for the same 2010 to 2014 time period, the second ALJ is bound by the first ALJ's determination. *See Earley*, 893 F.3d at 932. And if the new application covers a new time period, the second ALJ *may* abide by the first ALJ's determinations as long as

the claimant has failed to present "evidence of a change in condition" or satisfy a "new regulatory threshold." *Id.* This make sense because, in such a case, "[n]othing ha[s] changed between the end of the first application and the beginning of the second one." *Id.*

Otherwise, when someone seeks benefits for a distinct period of time, the new application "is entitled to review." *Id.* at 933. But on appeal, we need determine only whether the second ALJ *actually* afforded the new application a "fresh look" under *Earley*, notwithstanding rote recitation of a legal standard suggesting otherwise. *See Dennis D.*, 2024 WL 1193662, at *4. Despite Gooden's assertion that we "must reverse" if the ALJ applied an incorrect legal standard, *Earley* requires remand only when the judge *actually applied* incorrect res judicata principles. *See Cardew v. Comm'r of Soc. Sec.*, 896 F.3d 742, 746 (6th Cir. 2018) (stating that we review de novo "whether the ALJ applied the appropriate legal standard"). So under our precedent, the key question is whether the second ALJ treated review of the new application "as if" they were "bound by the prior decision." *Dennis D.*, 2024 WL 1193662, at *4. If not, then she did not reversibly err.

As in *Dennis D.*, the ALJ here did not treat the prior decision as binding. Indeed, the second ALJ *disclaimed* reliance on the first ALJ's determinations. Her new findings—several of which differ from the first ALJ's—support the conclusion that she assessed Gooden's second set of applications anew. The judge properly followed *Earley* and "engaged in an in-depth review and analysis of new evidence relevant to" Gooden's "current claim period as well as the evidence and findings from the prior decision." *Id.*

The analysis in *Dennis D.* provides helpful guidance. There, the second ALJ made what we described as a "scrivener's error" by stating that the first ALJ's residual functional capacity finding was "binding" for an "unadjudicated period . . . unless new and material evidence or changed circumstances provide a basis for a different finding." *Id.* (quotation omitted). We reasoned that the ALJ had made a harmless error in reciting the legal standard. Our finding rested on the fact that the ALJ *did* find that the claimant had produced "new and material evidence documenting a significant change" in the claimant's condition. *Id.* With that in mind, a "logical

reading of the paragraph" led us to determine that the ALJ's "real finding" complied with our caselaw requiring the ALJ to provide the new application an independent assessment. *Id.* (quoting *Calkins v. Sec'y of Health & Hum. Servs.*, No. 85-5685, 1986 WL 17083, at *2 (6th Cir. May 7, 1986) (per curiam)). The second ALJ in *Dennis D.* believed new evidence supported conducting an independent review. And the ALJ then conducted that independent review. *See id.*

We relied on the rest of the second judge's analysis in *Dennis D.* to emphasize why the judge had clearly engaged with the second application from scratch. For instance, the second ALJ said, "I am not bound" by the prior decision. *Id.* at *5. Then the judge "independently considered the medical experts' analyses," rejecting one of the first ALJ's impairment findings. *Id.* And the second judge assessed new evidence, medical records, and medical episodes from the time period postdating the first ALJ's denial. *Id.* Finally, we pointed to the fact that the second ALJ determined the claimant's residual functional capacity was less restrictive than in the first ALJ's assessment as further evidence that the second ALJ reached an independent conclusion. *Id.* (noting the "pointed difference in outcome").

In this case, the second ALJ adequately reviewed Gooden's new claim under *Earley*. She followed almost exactly the same set of analytical steps as the ALJ in *Dennis D.* Much of the same kinds of evidence that supported an independent assessment in *Dennis D.* also demonstrate that the ALJ here conducted a fresh review of Gooden's claim. Indeed, in this case, the second ALJ said that she "must adopt the prior decision's residual functional capacity . . . unless there is new and material evidence or changed circumstances . . . , or there has been a change in the relevant law." And then the judge continued, "Here, I do not adopt the prior ALJ decision, as the claimant has presented new and material evidence for the unadjudicated period." This is the same kind of error at issue in *Dennis D.*: regardless of whether the second ALJ recited a standard indicating she might be bound in other cases, in *this* case she expressly rejected the first opinion's findings and went on to make an independent assessment of Gooden's claim. *See id.* at *4; *see also Earley*, 893 F.3d at 932 ("An individual may file a second application—for a new period of time—for all

manner of reasons and obtain independent review of it *so long as* the claimant presents evidence of a change in condition or satisfies a new regulatory threshold." (emphasis added)). So the "real finding" here was a fresh one, regardless of the standard the ALJ recited at the beginning of her opinion.

As in *Dennis D.*, extensive reasoning in the ALJ's opinion supports our conclusion that the judge properly reviewed Gooden's new claim. The ALJ stated anew each of the steps in the evaluation she had to undertake to review Gooden's claim—including that she must "determine the claimant's residual functional capacity" and "consider all of the claimant's impairments, including impairments that are not severe." She noted ten impairments, two of which—obesity and degenerative disc disease—do not appear in the first opinion. True, she then made a residual functional capacity determination that agreed with parts of the first opinion. For instance, the judges agreed that Gooden could perform sedentary work, occasionally use foot controls with her left foot, and perform routine tasks. The judges also agreed that Gooden could occasionally balance, stoop, and climb ramps and stairs. But the similarities ended there.

The second ALJ balanced new testimonial evidence that Gooden provided, like a 2020 "Function Report," against other medical evidence. Some of the medical evidence appeared in the first ALJ's decision because it concerned diagnoses before Gooden's new disability onset date. But nearly all of the second ALJ's analysis focused on medical evidence from the period after the first decision. "Moving into the period at issue," she said, "in September 2018, imaging showed" Gooden's "aortic dissection." She referenced an October 2019 medical report showing that Gooden had continued to gain weight. She cited an April 2020 echocardiogram and further medical tests from July 2020. She described, among other recent documents, a September 2021 treatment report that assessed Gooden's gait, range of motion, and strength. And the judge considered a social worker's March 2020 progress notes, which indicated that Gooden told her provider that her medications were not helping.

The ALJ factored in scores of new datapoints, all of which resulted in new restrictions for Gooden's residual functional capacity: a ten-pound weight limitation; a standing/walking time limitation; a sitting time limitation; and only occasional exposure to extreme heat, cold, humidity and vibration. The second ALJ also determined—unlike the first—that Gooden should never kneel, crouch, or crawl and that she should not engage in commercial driving. In sum, the second ALJ adequately considered the evidence Gooden provided to support her new application. The depth of the judge's reasoning illustrates that she did not believe she was bound by the first judge. So she did not apply an incorrect legal standard.

Finally, we ask whether substantial evidence supports the judge's analysis of the two mental-health assessments that Gooden challenges on appeal. To be clear, Gooden challenges this portion of the judge's reasoning on the ground that both the judge and the consultants improperly relied on the first ALJ's determinations. But as we've explained, the judge did not apply an incorrect legal standard. It's "perfectly acceptable for a subsequent ALJ to presume the accuracy of a prior finding." *Dennis D.*, 2024 WL 1193662, at *6 (citing *Earley*, 893 F.3d at 933). And substantial evidence supports both the findings that the consultants made and the weight that the second ALJ gave those findings.

Gooden takes issue with 2021 reports from two mental-health consultants: Doctors Hill and Delcour. In those reports, the doctors "adopted" the "ALJ dated 4-23-18" because they found that Gooden's mental conditions "have not significantly changed since the date of the decision." In the second ALJ's opinion, after noting that she could not "defer or give any specific evidentiary weight" to "any prior administrative medical findings or medical opinions," she gave "careful consideration" to the mental-health reports, finding them "persuasive." But she considered the mental limitations identified in those reports by comparing their conclusions to a consultative exam that a psychologist—Doctor Twehues—conducted in December 2020.

In that evaluation, Doctor Twehues assessed Gooden's affect as "pleasant," "cooperative," "100% understandable," "normal," "adequately organized," and "somewhat tense" but

"not . . . overly anxious." She seemed "alert, responsive, and oriented to person, place, time, and situation." And Doctor Twehues noted that Gooden's "overall intellectual abilities are estimated to fall within normal limits." Based on this evaluation, the second ALJ concluded that the consultative exam was "generally unremarkable" and that the Hill and Delcour reports—which indicated little change in mental status since the first ALJ's decision—were persuasive. The judge punctuated that conclusion with a reference to Gooden's Function Report, in which Gooden admitted that she regularly prepared meals, did chores, shopped, and drove. In short, substantial evidence—evidence that the second ALJ cited—supports the judge's conclusion that the Hill and Delcour reports were persuasive.

## III.

Because the administrative law judge properly assessed Gooden's new claims, we **AFFIRM** the district court's judgment.